1
2
3
4
5

CHRISTOPHER W. KATZENBACH
(SBN 108006)
Email: ckatzenbach@kkcounsel.com
KATZENBACH LAW OFFICES
912 Lootens Place, 2nd Floor
San Rafael, CA 94901
Telephone: (415) 834-1778
Fax: (415) 834-1842

6
7
8
9

Attorneys for Plaintiffs AMERICAN AIRLINES
FLOW-THRU PILOTS COALITION,
GREGORY R. CORDES, DRU MARQUARDT,
DOUG POULTON,-STEPHAN ROBSON,
and PHILIP VALENTE III, on behalf of themselves and all
others similarly situated

10
11
12

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

13
14
15
16
17

18
19

20
21

22

AMERICAN AIRLINES FLOW-
THRU PILOTS COALITION,
GREGORY R. CORDES, DRU
MARQUARDT, DOUG POULTON,
STEPHAN ROBSON ,-and PHILIP
VALENTE III, on behalf of themselves
and all others similarly situated,

          Plaintiffs,
     vs.

ALLIED PILOTS ASSOCIATION and
AMERICAN AIRLINES, INC.,

        Defendants.

) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 

Case No.:  3:15-cv-03125 RS

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF FOR
BREACH OF DUTY OF FAIR
REPRESENTATION, VIOLATION
OF THE McCASKILL-BOND
AMENDMENT AND VIOLATION OF
SECTION 101(a)(4) OF THE LMRDA

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

23

## JURISDICTION AND VENUE

24
25
26
27
28

    1.   **JURISDICTION.**  This case arises from a breach of the duty of fair

representation in connection with the representation of employees in the airline

industry under the Railway Labor Act, 45 U.S.C. § 151 et seq., an Act regulating

interstate commerce, and violation of the labor protective provisions of the

McCaskill-Bond amendment, 42 U.S.C. § 42112 note and violation of Title I of the

1

Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401, et seq.  This Court has jurisdiction of this case under sections 1331 and 1337 of Title 28 of the United States Code and section 102 of the LMRDA, 29 U.S.C. § 412.

2.    **VENUE.**    Venue is appropriate in this judicial district pursuant section 1391(b) of the Title 28 of the United States Code as defendant Allied Pilots Association ("APA") is engaged in the representation of employees within this judicial district and defendant American Airlines, Inc. does business within this judicial district.

3.    **INTRADISTRICT ASSIGNMENT.**    Under Civil L.R. 3-2(b), assignment is proper in the San Francisco Headquarters or the Oakland division, as defendant Allied Pilots Association is engaged in the representation of employees at the San Francisco Airport.

## PARTIES

4.    Plaintiff AMERICAN AIRLINES FLOW-THRU PILOTS COALITION (herein "AAFTPC") is a subdivision of the American Eagle Pilots Association, a California Corporation.  AAFTPC is an association of pilots flying for American Airlines who obtained their positions at American Airlines pursuant to the terms of a multi-party agreement, referred to herein as the "Flow-Through Agreement," between (a) American Airlines,  (b) AMR Eagle, Inc., Executive Airlines, Inc., Flagship Airlines, Inc., Simmons Airlines, Inc., and Wings West Airlines, Inc., (jointly referred to herein as "American Eagle"), (c) the Allied Pilots Association (herein "APA") and the Air Line Pilots Association, International (herein "ALPA).  AAFTPC has in excess of 150 members, who are pilots flying for American Airlines and who obtained their employment at American Airlines pursuant to the terms of the Flow-Through Agreement.  The members of AAFTPC are referred to herein as "Flow-Thru Pilots" or "FTPs."  All the Flow-Thru Pilots are represented by the Allied Pilots Association and have suffered discrimination

1   and arbitrary treatment because they are Flow-Thru Pilots, as more fully alleged

2   below.  AAFTPC seeks to act in this action as the representative of the Proposed

3   Class described below.

4           5.      Plaintiffs GREGORY R. CORDES, DRU MARQUARDT, DOUG

5   POULTON, STEPHAN ROBSON, and PHILIP VALENTE III (herein "individual

6   representative plaintiffs") are pilots employed by American Airlines who obtained

7   employment at American Airlines pursuant to the terms of the Flow-Through

8   Agreement and are represented by APA, covered by the collective bargaining

9   agreement negotiated by APA with American Airlines and are on the AAL pilot

10  seniority list. The individual representative plaintiffs are members of AAFTPC.

11  The individual representative plaintiffs seek to act in this action as the

12  representatives of the Proposed Class described below.

13          6.      The Flow-Through Agreement was executed on May 5, 1997 and

14  expired in May 2008.   At the time the Flow-Through Agreement was executed,

15  and at material times thereafter, American Airlines and American Eagle were

16  corporations that were majority owned by AMR Corporation (herein "AMR").   On

17  or about December 9, 2013, AMR merged with US Airways Group, Inc. and the

18  merged entity became known as American Airlines Group, Inc. (herein "AAG").

19  At all times alleged in this Complaint, AMR or AAG controlled labor relations at

20  American Airlines and American Eagle, including the negotiation of collective

21  bargaining agreements and other agreements pertaining to the wages, hours and

22  terms and conditions of employment of pilots employed by American Airlines and

23  American Eagle.

24          7.      Defendant ALLIED PILOTS ASSOCIATION (herein "APA") is an

25  unincorporated labor organization and a representative of employees within the

26  meaning of section 1 Sixth and section 2 of the Railway Labor Act (45 U.S.C. 151

27  Sixth), as made applicable to carriers by air by sections 201 and 202 of the

28  Railway Labor Act (45 U.S.C. 181, 182) and a labor organization within the

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

meaning of Title I of the LMRDA (29 U.S.C. § 401, et seq.).   APA is the collective bargaining representative of AAL pilots.  The pilots represented by APA for purposes of terms and conditions of employment at AAL include all pilots on the AAL Pilot System Seniority list.

8.    Defendant AMERICAN AIRLINES, INC. (hereinafter "AAL") is a common carrier by air within the meaning of section 1 Sixth of the Railway Labor Act (45 U.S.C. 151 Sixth), as made applicable to carriers by air by sections 201 and 202 of the Railway Labor Act (45 U.S.C. 181, 182).  Defendant AAL is a party to a collective bargaining agreement with APA and is joined herein for purposes of permitting the Court to provide full relief for Plaintiffs on their claims.

## CLASS ACTION ALLEGATIONS

9.    Plaintiffs bring this action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

10.    The Proposed Class is composed of all the airline pilots who are employed by AAL and represented by APA and who obtained their employment at American Airlines pursuant to the terms of the Flow-Through Agreement.

11.    The Proposed Class is so numerous that joinder of all its members in a single action is impractical.  There are in excess of 400 pilots who are members of the Proposed Class.

12.    This action presents questions of fact and law that are common to all members of the Proposed Class.

(a)    The Proposed Class is commonly represented by APA pursuant to Certification by the National Mediation Board designating APA as the exclusive representative of the airline pilots employed by AAL for purposes of collective bargaining under the Railway Labor Act, as amended.

(b)    The actions of APA and AAL which form the subject of this action were directed at all members of the Proposed Class and affect their legal rights in the same or a substantially similar manner.

13.    The claims of the representative plaintiffs are typical of the claims of the Proposed Class.  The individual representative plaintiffs are pilots who obtained employment at American Airlines pursuant to the terms of the Flow-Through Agreement, who are represented by APA and whose terms and conditions of employment are governed by the collective bargaining agreement between APA and AAL.  The entity representative AAFTPC is an organization representing the interests of commonly-situated pilots who obtained employment at American Airlines pursuant to the terms of the Flow-Through Agreement, who are represented by APA and whose terms and conditions of employment are governed by the collective bargaining agreement between APA and AAL.   The claims of all members of the Proposed Class arose from the same events, from the same unitary course of conduct by APA and AAL, and are based on the same legal and remedial theories.

14.    The representative plaintiffs will fairly and adequately protect the interests of the Proposed Class.  The individual representative plaintiffs and AAFTPC have raised funds to support this action, will monitor this action, and will report to the Proposed Class material events occurring in connection with this action.

15.    This action is best maintained as a Class Action because:

(a)    The prosecution of this case as a class action is superior to actions by individuals or groups of individuals because the prosecution of separate actions would create a risk of inconsistent or varying adjudications as to the duty of APA towards the pilots it represents in collective bargaining with AAL.

(b)    APA and AAL have acted in concert on grounds generally applicable to the Proposed Class.  Declaratory or injunctive relief as to the breach

5

of duty alleged herein would apply to the members of the Proposed Class as a whole.

(c)    The common issues as to the breach of duty alleged herein predominate over questions that affect particular individual members of the Proposed Class.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.    BACKGROUND OF THIS CASE.**

**A.    The Flow-Through Agreement and The Rights To Positions At AAL For Commuter Jet Captains Flying For American Eagle.**

16.    As material to this case, AAL has two forms of seniority: Occupational seniority (also known as the "occupational date") and Classification seniority (also known as the "classification date"). Occupational seniority is used for determining placement on the Pilot System Seniority list and for bidding purposes. Classification seniority is used to determine pay level and the timing of advancement to succeeding pay levels.

17.    On May 5, 1997, AAL, American Eagle, APA and ALPA entered into the Flow-Through Agreement.

18.    The Flow-Through Agreement provided for employment opportunities at AAL for certain American Eagle pilots and provided that AAL pilots who were furloughed from jobs at AAL could take positions at American Eagle. The Flow-Through Agreement applied to captains flying commuter jets at American Eagle. The Flow-Through Agreement defined a "commuter jet" as an aircraft synonymous with the term "regional jet" that is a turbojet aircraft with at least forty-five passenger seats but not more than seventy seats. The Flow-Through Agreement defined "CJ Captain" as synonymous with the term "RJ Captain" as a captain position on a commuter jet aircraft.

19.     Prior to the Flow-Through Agreement, APA sought to have all regional turbojet aircraft purchased by AMR or used at American Eagle flown only by AAL pilots represented by APA.  Prior to the Flow-Through Agreement, AAL pilots, by a majority vote, had rejected a proposed collective bargaining agreement that allowed AMR to have American Eagle pilots fly regional turbojet aircraft.

20.     Prior to the Flow-Through Agreement, APA asserted, among other things, and following the vote of AAL pilots to reject the proposed agreement as alleged in Paragraph 19, that:

a.  Regional jets should be flown only by American Airlines pilots.

b.  The flying of regional jets by American Eagle took jobs away from AAL pilots represented by APA.

c.  Pilots at AAL and American Eagle were competing for the work of flying regional turbojet aircraft.

d.  The new generation of regional turbojet aircraft with 50 or more seats, including turbojet aircraft being purchased for American Eagle, were the equivalent of mainline jets and mainline flying, for reasons including (i) the new regional turbojets used technology with performance capabilities exceeding many mainline turbojet aircraft, (ii) the new regional turbojets had the capability of flying the longer routes that mainline carriers typically flew and (iii) by using the new regional turbojet aircraft, American Eagle would be in direct competition with AAL for flying existing and new mainline routes.

21.     From the time the issue of flying regional turbojets arose, until the present, (a) APA has continued to adhere to the positions stated in paragraph 20 and (b) many pilots at AAL, including pilots who subsequently were officers of APA, stated that pilots flying for American Eagle were inferior pilots and, in flying regional jets, were taking jobs away from pilots at AAL.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

22.     APA was unsuccessful in obtaining an agreement to have all regional turbojet aircraft purchased by AMR or used at American Eagle flown only by AAL pilots represented by APA.  Thereafter, APA proposed that AAL pilots obtain furlough protection from loss of jobs at AAL by having the right to be furloughed down to American Eagle and displace a regional jet captain at American Eagle.  In return for this furlough protection for AAL pilots, American Eagle regional jet captains would receive the right to preferential hiring at AAL.  These proposals eventually resulted in the Flow-Through Agreement.

23.     From on or about May 5, 1997 through the present date, the collective bargaining agreement between APA and AAL has limited the number and size of turbojet aircraft that could be flown by pilots at American Eagle.   In the most recent collective bargaining agreement between APA and AAL, the limitation on the size of turbojet aircraft that can be flown at American Eagle is 76 or less passenger seats.

24.     The Flow-Through Agreement was incorporated into and included as part of the collective bargaining agreements between APA and AAL and between ALPA and American Eagle.  It is known as Supplement W to the APA/AAL agreement and Letter 3 to the ALPA/American Eagle agreement.

25.     Under the terms of the Flow-Through Agreement, AAL was required to offer qualified CJ Captains at American Eagle positions in new hire classes at AAL in the ratio of one for every two positions in the new hire class.   At the time the Flow-Through agreement was negotiated, APA and AAL understood that the agreement gave CJ Captains at American Eagle a right to jobs at AAL.

26.     At the time the Flow-Through agreement was negotiated, AAL was normally disinclined to hire American Eagle pilots because of consequent, costly training cycles triggered at American Eagle when senior pilots left American Eagle for jobs elsewhere.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

27.     Under the terms of the Flow-Through Agreement, CJ Captains obtained Occupational seniority numbers on the AAL pilot seniority list at the time they were offered a position in a new hire training class at AAL whether or not they were able to attend such training class.  The CJ Captains who obtained such seniority numbers are among the FTPs in this action.

28.     The parties to the Flow-Through Agreement intended that the Occupational seniority numbers obtained under the agreement would be real seniority numbers and would give CJ Captains at American Eagle an on-going interest in the terms and conditions of employment at AAL and the terms of the APA/AAL collective bargaining agreement.

29.     Under the terms of the Flow-Through Agreement, if the CJ Captain could not attend the new hire class at AAL because of a training freeze or other operational reason, the pilot would have first priority for positions in new hire classes once the training freeze or other operational reason expired.

30.     Paragraph III.A, III.B and III.D of the Flow-Through Agreement provided, in material part:

> A. At least one (1) out of every two (2) new hire positions per new hire class at AA will be offered to CJ Captains who are line pilots and who have completed their IOE at AMR Eagle, Inc. Such positions will be offered to the CJ Captains who are line pilots in order of their AMR Eagle, Inc. seniority.
>
> B. If a CJ Captain is unable to fill a new hire position at AA in accordance with Paragraph III.A. above, due to a training freeze or other operational constraint, (see Paragraph III.J. below), such CJ Captain will be placed on the AA Pilots Seniority List and will count toward the number of new hire positions. The pilot's AA occupational seniority date and number will be established as if he were able to fill such new hire position at AA and had attended the new hire training class referenced in Paragraph III.A. above.
>
> ***

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

> D.  If a CJ Captain is placed on the AA Pilots Seniority
> List per III.B. above, such CJ Captain will receive
> priority based on his AA seniority in filling a new hire
> position in the next new hire class, following release
> from a training freeze or other AMR Eagle, Inc. imposed
> operational constraint.  Such CJ Captains will not count
> toward the number of new hire positions offered to CJ
> Captains at AMR Eagle, Inc., under Paragraph III.A.
> above.

31.    Under the terms of the Flow-Through Agreement, AAL pilots furloughed from AAL could take jobs at American Eagle and displace American Eagle CJ captains who were still flying at American Eagle before the American Eagle CJ captain moved to AAL.  Paragraph IV.A. of the Flow-Through Agreement provided:

> A.  A pilot furloughed from AA may displace a CJ
> Captain at an AMR Eagle, Inc. carrier provided that the
> number of CJ Captain positions available to furloughed
> AA pilots will be limited to the total number of CJ
> Captain positions at AMR Eagle, Inc. less the number of
> Eagle Rights CJ Captains.

32.    Prior to September 2001 approximately 513 FTPs had obtained AAL Occupational seniority numbers and were on the AAL Pilot System Seniority list. All these pilots were held back at American Eagle for 18 months to two-years after receiving their Occupational seniority numbers.   The FTPs were prevented from filling positions in new hire training classes when such positions were first offered and available to them.  The FTPs withheld at American Eagle continued to staff the airline and allow American Eagle to use the FTPs, who were experienced airline captains, for operations at American Eagle and to recoup AMR's and American Eagle's investment in training these pilots.   The withholding of FTPs from transfer to AAL was beyond the control of FTPs and was solely for the benefit of AAL, AMR and American Eagle.

33.    Prior to September 2001, of the FTPs who had obtained AAL Occupational seniority numbers, approximately 124 pilots had transferred to AAL

1   and had begun flying as pilots at AAL.  The remaining FTPs who had obtained

2   AAL Occupational seniority numbers had been held back at American Eagle

3   because of American Eagle's operational needs and were, therefore, unable to

4   attend new hire classes at AAL prior to September 11, 2001.

5                **B.     The Acquisition of TWA by AAL.**

6          34.    In 2001 AAL acquired the assets of TransWorld Airlines (herein

7   "TWA").  An entity known as TWA-LLC was thereafter established to operate

8   TWA's routes.  TWA-LLC was a wholly-owned subsidiary of AAL operating

9   under its own certification as an airline carrier.  Pilots employed by TWA became

10  employees of TWA-LLC and operated under certification issued by the Federal

11  Aviation Administration ("FAA") that was separate from the certification by the

12  FAA issued to AAL.

13         35.    At some point after April 3, 2002, the TWA-LLC pilots were

14  integrated into the AAL Pilot System Seniority list and received AAL

15  Occupational seniority numbers.  Approximately 1067 TWA-LLC pilots were

16  integrated into the AAL Pilot System Seniority list interspersed with AAL pilots at

17  a ratio of approximately 1:8.  The remaining approximately 1225 TWA-LLC pilots

18  were placed at the bottom of the AAL Pilot System Seniority list (herein referred

19  to as the "TWA-LLC Staplees").

20         36.    In determining the 1:8 integration ratio, APA counted FTPs on the

21  AAL pilot seniority list, including those still flying at Eagle, in determining the

22  number of AAL pilots to be used to justify the 1:8 ratio that was used.

23         37.    At the time the integration of the TWA-LLC pilots into the AAL pilot

24  seniority list, AAL was in the process of furloughing AAL pilots.  Between late

25  2001 and May 2003, AAL placed approximately 1,000 AAL pilots on furlough.

26         38.    In addition to the AAL pilots placed on furlough, the TWA-LLC

27  Staplees were furloughed from TWA-LLC.  Prior to being put on furlough, the

28  TWA-LLC Staplees did not perform any work for AAL.

39.     On or about March 5, 2002, the National Mediation Board ("NMB") determined that AAL and TWA-LLC were operating as a "single transportation system" for purpose of the Railway Labor Act ("RLA") and on April 3, 2002, the NMB extended APA's certification to cover pilots at TWA-LLC as part of a single transportation system with AAL.

40.     The actions of the NMB alleged in paragraph 39 did not alter the terms of the collective bargaining agreement between AAL and APA.  The actions of the NMB alleged in paragraph 39 did not themselves make the AAL/APA collective bargaining agreement applicable to pilots at TWA-LLC who had not been hired by AAL and who remained as TWA-LLC employees.

41.     TWA-LLC continued to operate as a separate air carrier under a separate certification by the FAA until on or about August 31, 2004.

### C.     APA's Pattern and Practice Favoring TWA Pilots Over FTPs.

#### 1.     Giving TWA pilots new rights to flow-down and displace Eagle pilots, including FTPs, from their jobs.

42.     As part of the AAL-TWA merger, APA and AAL initially agreed in November 2001 that the TWA-LLC pilots would not have the ability to flow-down to American Eagle under the provisions of Paragraph IV of the Flow-Through Agreement until pilots already on the AAL seniority list before September 2001 were recalled from furlough.   In particular, they had agreed that TWA pilots would not be covered by Paragraph IV of the Flow-Through Agreement until pilot J.K Viele was recalled from furlough.

43.     Plaintiffs are informed and believe, and thereon allege:  The layoffs of AAL pilots between late 2001 and May 2003 (a) made it improbable that pilot J.K. Viele would be recalled at any proximate time to May 2003 and (b) made it improbable that pilot J.K Viele would be recalled before 2005 or later.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

44.    On May 1, 2003, AAL and APA revised their agreement to allow the TWA-LLC pilots to flow down to American Eagle.   These revisions are contained in documents signed by AAL and accepted by APA known as Letter OO and Letter PP.

45.    The agreement to allow the TWA-LLC pilots to flow-down to American Eagle adversely affected the interests of FTPs with AAL seniority numbers and other pilots at American Eagle as it (a) allowed TWA-LLC pilots to displace FTPs and other jet captains at American Eagle from positions as aircraft captains before pilot J.K. Viele was recalled and (b) treated all TWA-LLC pilots as if they were furloughed AAL pilots regardless whether the TWA-LLC pilot had been employed by AAL or was laid off from a position at AAL or at TWA-LLC.

46.    At all times from January 1997 to date, Section 2.T of the collective bargaining agreements between APA and AAL defined furlough as:

> "Furlough" means the removal of a pilot from active duty as a pilot with the Company without prejudice, due to a reduction in force, or the period of time during which such pilot is not in the active employ of the Company as a pilot due to such reduction in force.

47.    At all times from January 1997 to date, Section 17.V.4 of the collective bargaining agreements between APA and AAL provided:

> A pilot furloughed by the Company due to a reduction in force shall continue to accrue seniority during the period of such furlough.  Length of service for pay purposes shall not accrue during such period of furlough.

48.    Pilots furloughed from TWA-LLC without working at AAL did not qualify as furloughed pilots under the definitions of the AAL/APA collective bargaining agreement alleged in Paragraphs 46 and 47.

49.    The agreement to allow pilots furloughed from TWA-LLC to flow-down to American Eagle under the provisions of the Flow-Through Agreement abrogated the rights of FTPs (a) under the provisions that limited flow-downs to

AAL pilots who were furloughed from active duty at AAL due to a reduction in force and (b) included TWA-LLC pilots under the flow-down provisions (i) before pilot J.K Viele would be recalled and (ii) where the TWA-LLC pilots were furloughed from TWA-LLC not AAL. This agreement was not submitted for approval by the pilots at American Eagle or by ALPA, the union representing the American Eagle pilots.

50.     After this agreement, at least 174 former TWA-LLC pilots flowed-down to American Eagle and displaced pilots at American Eagle, including FTPs. But for the agreements alleged in Paragraph 44 and 45, pilots at American Eagle, including FTPs, would not have been displaced from their jobs at American Eagle by TWA-LLC pilots.

## 2.    Favoring TWA-LLC Staplees for new positions at AAL when hiring re-started in 2007.

51.     Because of economic and other conditions, after September 2001, AAL did not conduct new hire training classes until 2007. AAL began recalling pilots from furlough in January 2007. The first new hire training class conducted by AAL following September 2001 occurred on June 6, 2007.

52.     On May 11, 2007, Arbitrator John B. LaRocco, in Case No. FL0-0903, ruled that the TWA-LLC Staplees were new-hire pilots and their hiring by AAL involved hiring for "new hire positions" for purposes of the Flow-Through Agreement and the rights of FTPs to employment at AAL for new-hire positions.

53.     At all times, the number of TWA-LLC pilots with AAL pilot seniority numbers obtained as part of the AAL-TWA merger has been more than four times the number of FTPs with AAL pilot seniority numbers obtained under the Flow-Through Agreement.

54.     APA has regularly and repeatedly acted against the interests of the FTPs as to their terms and conditions of employment at AAL. APA has acted to advance the interests of other pilot groups as to the terms and conditions of

14

employment at AAL for these other pilot groups over the interests of the FTPs, contrary to the interests of the FTPs and without taking account of the interests of the FTPs.

55.    Among other things:

(a)    APA and AAL agreed to give TWA-LLC pilots, including the TWA-LLC Staplees, the right to flow-down to American Eagle and displace FTPs still flying at American Eagle. But for this agreement, the TWA-LLC pilots had no right to flow-down to American Eagle.

(b)    APA agreed with AAL to have TWA-LLC Staplees, who were below FTPs on the AAL pilot seniority list, placed into new-hire classes beginning in June 2007 ahead of FTPs with superior AAL Occupational seniority numbers.

(c)    After FTPs had been excluded from new-hire positions at AAL to which they were entitled under Arbitrator LaRocco's May 11, 2007 decision, APA urged that AAL seniority numbers for FTPs should be forfeited for FTPs who had not begun working for AAL before May 2008.

56.    To remedy violations of the Flow-Through Agreement by APA and AAL, additional AAL seniority numbers were awarded to 154 FTPs who had not been offered positions in new hire classes that had been given to the TWA-LLC Staplees and who would have obtained AAL seniority numbers had they been called for the new-hire classes that were given to the TWA-LLC Staplees. These 154 additional AAL seniority numbers had an effective date of April 30, 2008.

1

2

### 3. Protecting the advantages TWA-LLC Staplees received because of the violations of the FTPs rights under the Flow-Through Agreement.

3

4

5

6

7

8

9

10

57.    In connection with remedy proceedings arising from arbitration decisions finding that FTPs were entitled to attend AAL new hire classes beginning in June 2007 and had been denied such positions, in particular Arbitration No. FLO-0108 before Arbitrator George Nicolau, AAL and APA entered into an agreement providing that Arbitrator Nicolau would issue a remedy award that was adverse to the interests of the FTPs who should had been awarded positions ahead of TWA-LLC Staplees who obtained those positions and deprived FTPs of their existing priority in hiring for future positions.

11

12

13

14

15

16

17

18

19

20

21

58.    This agreement favored the interests of TWA-LLC Staplees over FTPs.   In particular, APA and AAL agreed that (a) only 35 of the 244 FTPs whose rights had been violated would be given priority for positions at AAL, (b) 83 TWA-LLC Staplees who had been hired in violation of the Flow-Through Agreement but who had been laid off during the remedy hearings would be allowed to return to AAL ahead of the remaining FTPs, (c) 286 FTPs (out of 527 FTPs) would be required to execute an irrevocable choice whether to take a position at AAL before any such position was available for them, (d) all future flow-up to AAL when new positions became available would be based solely on AAL seniority numbers and (e) that no pension years-of-service credits would be given FTPs for the time they were wrongly withheld from positions at AAL.

22

23

24

25

26

27

59.    The terms of the requested remedy alleged in Paragraph 58 changed the terms of the Flow-Through Agreement and impaired and abrogated the FTPs rights under the Flow-Through Agreement, including (a) subordinating and abrogating the FTPs' rights to jobs they had been denied to the interests of TWA-LLC pilots and (b) changing the future flow-up from the priorities in hiring provided in the Flow-Through Agreement in Paragraphs III.A. and III.D.   Such

28

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1    changes abrogated the rights of FTPs covered by the APA/AAL collective

2    bargaining agreement and permitted the TWA-LLC Staplees to accrue rights to

3    positions at AAL contrary to the terms of the Flow-Through Agreement, that had

4    been made a part of the APA/AAL collective bargaining agreement as Supplement

5    W.  APA's agreements to these changes violated the duties under Section 24.F. of

6    the collective bargaining agreements between APA and AAL that provided:  "It is

7    understood and agreed that the rights of any pilot covered by this Agreement shall

8    not be abrogated in any way by the provisions of any other labor agreement and no

9    such pilot shall be permitted to accrue rights in abrogation of the terms of this

10   Agreement."

11         60.    Plaintiffs are informed and believe, and thereon allege, that APA,

12   AAL, American Eagle and ALPA (a) agreed to conceal the fact that the remedy in

13   FLO-0108 was in fact a negotiated agreement, (b) agreed to have the arbitrator

14   issue the agreements alleged in Paragraph 58 as if these agreements were an

15   arbitration decision by a neutral arbitrator rather than a negotiated agreement, (c)

16   made such an agreement in order to avoid claims that APA or ALPA had breached

17   their duty of fair representation and (d) agreed to conceal the fact that the

18   arbitration award was based on the agreement of the parties, rather than a decision

19   by the arbitrator, to avoid claims that this agreement breached the duty of fair

20   representation APA and ALPA owed their members by agreeing to the terms

21   alleged in Paragraph 58.

22         61.    Plaintiffs are informed and believe, and thereon allege, that APA and

23   ALPA agreed to the terms alleged in Paragraph 58 because (a) ALPA obtained

24   new benefits for other pilots at American Eagle that would allow these pilots a new

25   right to jobs at AAL that they no longer had because of the expiration of the Flow-

26   Through Agreement and (b) APA ensured that the TWA-LLC Staplees would be

27   given new positions at AAL ahead of FTPs on the AAL seniority list.

28

62.    But for the actions of APA favoring the TWA-LLC Staplees, FTPs would have received positions at AAL ahead of the majority of TWA-LLC Staplees.  Plaintiffs are informed and believe, and thereon allege that, but for APA's actions in having TWA-LLC Staplees hired before FTPs starting in 2007 and in negotiating the terms alleged in Paragraph 58, (a) all FTPs with AAL seniority numbers ahead of the least senior TWA-LLC Staplee would have been working at AAL before the end of 2009 and (b) the remaining FTPs with occupational seniority date of April 30, 2008, would have been working at AAL on or before the end of 2010.

**4.    Favoring the TWA pilots in the Equity Distribution process and adopting rules targeting and disfavoring FTPs.**

63.    Because of modifications to the collective bargaining agreement made as a result of a bankruptcy filing by AAL, APA and AAL agreed that APA would receive, for distribution to pilots, a part of the equity AAL distributed to unsecured creditors after reorganization in bankruptcy.  Thereafter, APA received such an equity distribution from AAL.

64.    To distribute the equity received by APA alleged in paragraph 63, APA formed an Equity Distribution Committee ("EDC").

65.    In formulating a plan for equity distribution, the EDC set qualifications and a methodology that (a) excluded FTPs with American seniority numbers who had not yet flowed-up to AAL from certain parts of the equity distribution benefits even if they eventually flowed-up to AAL before the cut-off date; and (b) excluded FTPs still at Eagle from all benefits if they did not flow-up before August 1, 2013.

66.    The August 1, 2013 cut-off date was chosen by APA or the EDC. Plaintiffs are informed and believe, and thereon allege, that this date was adopted because APA or the EDC anticipated that all TWA-LLC pilots would meet this

1    deadline, while the remaining FTPs at Eagle would not meet this deadline and

2    thereby be excluded from any equity distributions.

3         67.    The EDC adjusted benefits for TWA-LLC pilots and created a special

4    model for them to increase the TWA-LLC pilots' payout purportedly based on the

5    circumstances under which the TWA-LLC pilots came to American and under

6    principles of general fairness.  APA did not make similar efforts to account for the

7    particular circumstances of FTPs or to make adjustments based on fairness for the

8    FTPs.  The EDC credited TWA-LLC pilots with years of service for pension

9    accrual before the TWA-LLC pilots began flying for American, but credited FTPs

10   with years of service credit only from the point the FTPs began flying for

11   American and notwithstanding the fact that the delay in FTPs moving to American

12   was caused by APA's favoritism of TWA-LLC pilots and violations of the Flow-

13   Through Agreement.

**II.    THE SENIORITY LIST INTEGRATION WITH PILOTS FROM US AIRWAYS.**

**A.    AAL's acquisition of US Airways and the Seniority List Integration Process.**

14

15

16

17        68.    In about 2013, AAL purchased the assets of US Airways ("USAir").

18        69.    The purchase of USAir's assets invoked the requirements of the

19   McCaskill-Bond amendment ("McCaskill-Bond") to the Federal Aviation Act, 49

20   U.S.C. § 42112 note.  McCaskill-Bond requires carriers to observe sections 3 and

21   13 of the labor-protective provisions ("LPPs") imposed by the Civil Aeronautics

22   Board (CEB) in the Allegheny-Mohawk merger.

23        70.    Section 3 of the Allegheny-Mohawk LPPs establishes that seniority

24   integration shall be fair and equitable, as follows:

25

26               Insofar as the merger affects the seniority rights of the
                 carriers' employees, provisions shall be made for the
27               integration of seniority lists in a fair and equitable
                 manner . . . .

28

19

71.    Section 13 of the Allegheny-Mohawk LPPs requires arbitration if the parties cannot agree on an integrated seniority list.

72.    The fair and equitable standard under McCaskill-Bond is based on an evaluation of the affected pilot groups' reasonable pre-merger career expectations.

73.    APA and AAPSIC understood that the fair and equitable standard under McCaskill-Bond includes the following factors:

a.    The integrated seniority list must be constructed to reflect those pre-merger expectations; to share the future "upside" and "downside" in a manner consistent with those pre-merger expectations; and to avoid undue windfalls to one pre-merger group.

b.    Seniority for purposes of constructing an integrated seniority list is based on the bidding power it confers on the pilot within a particular system.

c.    Pre-merger jobs in different categories or statuses may be comparable in weighing premerger expectations and constructing a fair and equitable integrated seniority list.

d.    An integrated seniority list must recognize that the career path of a commercial airline pilot typically traces an onward and upward trajectory:  Beginning as a new-hire regional First Officer, under regional terms and conditions of employment; progressing to regional Captain; starting over as a new-hire First Officer at a mainline carrier, under mainline terms and conditions of employment; and progressing, finally, to mainline Captain.

e.    Every seniority integration proceeding is unique and turns on its own facts.

74.    At the time of the SLI arbitration proceedings, APA and AAPSIC understood that (a) the normal career trajectory of pilots at American Eagle had, prior to the Flow-Through Agreement, been adversely impacted because AAL

20

1    appeared normally disinclined to hire American Eagle pilots because of

2    consequent, costly training cycles triggered at American Eagle when senior pilots

3    left American Eagle and (b) the Flow-Through Agreement was intended to

4    overcome the disinclination of AAL to hire pilots from American Eagle and give

5    American Eagle regional jet captains a right to be hired at AAL.

6        75.    In connection with the USAir purchase, APA and pilot groups from

7    USAir created a process to develop a new integrated AAL pilot seniority list,

8    herein "ISL."  The process of developing a new integrated seniority list is known

9    as "seniority list integration" or "SLI."   The SLI issues as to AAL and USAir were

10   submitted to arbitration.

11       76.    AAL will be bound by and will use the resulting integrated seniority

12   list for purposes of hiring, furlough, pay, benefits and employment opportunities at

13   AAL.

14   **B.    APA Refuses To Represent The Interests Of**

15   **FTPs In The SLI Process And Refuses To**

16   **Provide FTPs Explanations Of Its Positions.**

17       77.    Prior to the start of the SLI process, Plaintiff AAFTPC requested that

18   it be allowed to participate in the SLI process as an interested party.  APA refused

19   this request.  APA asserted that it would represent the interests of the FTPs in

20   connection with the SLI process and related arbitration.

21       78.    Under longstanding practice in seniority list integration arbitrations in

22   the airline industry, longevity of employment is a significant factor for purposes of

23   integrating seniority for the pilots of the merging airlines.

24       79.    The interests of AAL pilots in the SLI arbitration were delegated by

25   APA to a committee known as the American Airlines Pilot Seniority Integration

26   Committee or AAPSIC.  At all material times, AAPSIC acted as an agent of APA.

27       80.    In connection with the SLI process, plaintiffs are informed and

28   believe, and thereon allege, that:  (a) APA or AAPSIC entered into a stipulation

1    that service at regional affiliated airlines (including American Eagle) would not be

2    counted for purposes of longevity in integrating seniority and (b) this stipulation

3    harmed the FTPs disproportionally to any other group of pilots on the proposed

4    integrated seniority list, including benefitting TWA-LLC Staplees who were hired

5    in 2007 in new hire classes instead of the FTPs and thereby had obtained additional

6    longevity at AAL in positions that should have been offered to FTPs.

7        81.    In connection with the SLI process, on or about June 19, 2015,

8    AAPSIC submitted a proposed integrated seniority list that harmed the FTPs by

9    moving their seniority positions lower (that is, less senior) on the integrated

10   seniority list by:

11           (a)    Putting FTPs in the same tier with the USAir pilots with the

12                  lowest seniority at USAir and by placing all pilots hired post-

13                  2007 at the bottom of the integrated seniority list.

14           (b)    Putting a group of approximately 755 USAir pilots ahead of

15                  approximately 124 of the FTPs who were the least-senior FTPs

16                  on the integrated seniority list.  APA's proposal put the TWA-

17                  LLC Staplees ahead of these 755 USAir pilots on the integrated

18                  seniority list.   These 124 FTPs consist of the 154 FTPs

19                  remaining in active flying who were awarded AAL seniority

20                  numbers because of APA's and AAL's agreement to hire TWC-

21                  LLC Staplees for new hire classes ahead of the FTPs.

22       82.    No other AAL pilots, including TWA-LLC pilots, were adversely

23   affected by the insertions of US Airways pilots alleged in paragraph 81 or the

24   methodology used by APA or AAPSIC in developing its proposed integrated

25   seniority list.   The use of a post-2007 date adversely affected FTPs only and, in

26   particular, adversely affected the FTPs who were awarded seniority numbers

27   because of the violations of the Flow-Through Agreement.

28

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

83.     AAPSIC did not offer a reasonable or rational reason to select a post-2007 date, as alleged in Paragraph 81(a).

(a)     AAPSIC asserted that the post-2007 date was based on the date new pilots were hired by USAir after the date the merger of US Airways and America West Airlines was announced in 2005. This was a date new pilots hired by USAir would have known that their placement on a US Airways seniority list would be affected by the US Airways and America West Airlines merger. This date is generally referred to as a "Constructive Notice Date" and pilots hired after that date are known as "Constructive Notice Pilots."

(b)     The Constructive Notice Date for the USAir / America West Airlines merger was May 19, 2005. The Constructive Notice Date for the AAL/USAir merger was December 9, 2013.

(c)     The Constructive Notice Date for the US Airways and America West Airlines merger has no relationship to the AAL/USAir merger, seniority issues for AAL pilots or the Constructive Notice Date for the AAL/USAir merger.

(d)     The Post-2007 date has no relationship to any Constructive Notice Date or any group of Constructive Notice Pilots. The Post-2007 date only has the effect of harming the seniority position of FTPs and protecting the seniority position of other AAL pilots, in particular the TWA-LLC Staplees.

84.     On June 25, 2015, Plaintiffs asked AAPSIC to explain its positions and the reasons for its positions alleged in Paragraphs 80 and 81. In response, AAPSIC stated that it had withdrawn its positions. AAPSIC explained that it had not credited longevity at American Eagle because only mainline longevity has been credited in previous arbitrations involving other carriers.

23

1    85.    AASPIC's position alleged in Paragraph 84 was inconsistent with

2  AASPIC's understanding of the factors on which an integrated seniority list should

3  be based, as alleged in Paragraphs 72 and 73, and (a) did not take into account the

4  relationship between AAL and American Eagle and AMR's control over both

5  airlines' labor policies; (b) it did not take into account the terms of the Flow-

6  Through Agreement and the career expectations of FTPs arising from the Flow-

7  Through Agreement; (c) did not take into account or recognize APA's prior and

8  longstanding position that flying regional jet aircraft involved "mainline" flying;

9  (d) relied on prior arbitrations that were conducted under union merger policies

10  that had expressly defined what service could be credited in a way that excluded

11  the service at the regional airlines involved in those merger situations, whereas the

12  SLI process is not being conducted pursuant to such merger policies or any similar

13  merger policies; (e) did not take into account that flying time at USAir included

14  time flying regional jet aircraft for USAir that was at least equivalent to time FTPs

15  flew regional jet aircraft at American Eagle; (f) was contrary to its own

16  understandings that a pilot's career expectations included moving from a regional

17  carrier to a mainline carrier and that the Flow-Through Agreement was intended to

18  overcome AAL's disinclination to hire American Eagle pilots under this normal

19  career progression because of the additional costs this would cause American

20  Eagle to incur; (g) was contrary to its own understanding that each seniority

21  integration case turns on its own facts; (h) made the AAL, AMR and American

22  Eagle corporate structures more significant than the pre-merger career expectations

23  of pilots.

24    86.    On or about September 2015, AAPSIC and the other participants in

25  the SLI process submitted revised statements of position as to how the integrated

26  seniority list should be constructed.  AAPSIC's submission changed some of its

27  previous position from its prior submissions, including the positions alleged in

28  Paragraph 81.  The other participants in the SLI process urged that longevity

24

1  should be a factor in the resulting seniority list; AAPSIC took the position that

2  longevity should not be a factor.

3       87.    At all material times throughout the SLI process, AAPSIC took the

4  position that, if longevity was a factor, time flying at American Eagle should not

5  be included as part of longevity because American Eagle was not a mainline

6  carrier.

7       88.    On October 9, 2015, Plaintiffs requested additional information on

8  AAPSIC's position.  In particular, Plaintiffs requested that AAPSIC explain the

9  reasons for its change of position.  In addition, Plaintiffs requested AAPSIC to

10  explain how it intended to address the longevity arguments made by the other

11  participates and whether AAPSIC agreed that service at regional carriers should be

12  excluded.   Plaintiffs asked if AAPSIC was prepared to make a stand that the

13  longevity for purposes of an integrated seniority list includes time flying as an

14  Eagle Captain under the terms of the Flow-Through Agreement, noted that there

15  was overwhelming evidence to support the position that the time that a FTP was

16  flying as a Captain at Eagle should be viewed as de-facto "mainline time" for the

17  purposes of longevity, and describing that evidence.  Plaintiffs further noted

18  concern that AAPSIC was listing no witnesses that could address this factual issue.

19  Plaintiffs further asked if AAPSIC would be presenting evidence to support the

20  FTPs' contention that any longevity that might be used should include service at

21  American Eagle and, if not, what was AAPSIC's explanation for not presenting

22  such evidence.

23       89.    AAPSIC did not respond to Plaintiffs' letter of October 9, 2015.

24       90.    Plaintiffs sent a letter to AAPSIC on December 21, 2015 asking for a

25  response to the matters stated in the October 9, 2015 letter.  Plaintiff's December

26  21, 2015 letter noted that the other merger committees had proposed longevity

27  factors for the ISL.  Plaintiffs' letter stated that, because the other committees

28  proposed longevity as a factor, "there is a significant possibility that a longevity

factor will be used in a final seniority list." The letter discussed the various longevity proposals and how these particularly harmed the FTPs. The letter again stated that AAPSIC must present argument and evidence that excluding time at American Eagle would be arbitrary and inequitable in this case. The letter discussed the proposals by the other merger committees and how those proposals, including use of longevity as a factor, harmed FTPs. The letter also noted that the USAir merger committees proposed that both Captains and First Officers flying regional jet equipment at USAir would be credited for longevity, yet American Eagle Captains flying similar regional jets would not get longevity credit.

91. On January 7, 2016, AAPSIC responded stating that, because Plaintiffs had instituted litigation against APA for breach of the duty of fair representation, it would not respond to the matters raised in the October 9 or December 21 letters and would not provide the information requested.

92. After January 7, 2016, AAPSIC submitted additional evidence and argument in the SLI arbitration. AAPSIC did not present any evidence or argument in support of including time at American Eagle in any longevity factor that might be used and continued to assert that time at American Eagle should be excluded from any longevity factor because American Eagle was not a mainline carrier.

**C.    The SLI Decision Uses Longevity As A Factor, Excludes Time At American Eagle And Fails To Account For The Delay In Working For AAL Arising From The Violations Of The Flow-Through Agreement.**

93. On September 6, 2016, the arbitrators in the SLI proceeding issued a decision and an ISL. The arbitration decision purports to apply McCaskill-Bond and to integrate seniority on a fair and equitable basis, and, in that regard,

expressly relies on factors relating to the career expectations of the various pilots and pilot groups.

94.     In the award and ISL, longevity was included as a factor in placement on the ISL.

95.     In determining longevity, the arbitrators excluded all time working at Eagle, including time FTPs worked at Eagle after receiving seniority numbers at AAL.

96.     In rejecting including time flying at Eagle as RJ Captains as part of longevity, the arbitrators asserted that time flying at American Eagle was "non-mainline service."  At the same time, the arbitrators counted for longevity time flying at USAir for pilots flying as First Officers or Captains of regional jets flown by USAir that were, in all material respects, the same as the regional jets flow by the FTPs at Eagle.

97.     Because time at American Eagle as was not included as part of the longevity factor that was used, the ISL is inequitable and unfair to FTPs and does not fairly preserve their career expectations at AAL.  Among other things:

a.     FTPs had rights and expectations under the Flow-Through Agreement that their careers including flying at AAL and flying the larger aircraft associated with the domestic and international routes AAL flew.

b.     USAir pilots who were only First Officers on regional jets at USAir have been consistently place above FTPs who were Captains on regional jets at Eagle and had many more years of experience than the USAir pilots.

c.     The exclusion of time at American Eagle perpetuated the effects of prior discrimination against FTPs and previous violations of the Flow-Through Agreement.  (i) FTPs lost time they would have been flying at AAL and time included in the longevity factor because TWA-LLC Staplees were hired, and kept in, positions at AAL that should have

gone to FTPs.  (ii) TWA-LLC Staplees retained the advantage of the time they worked at AAL after being placed in new hire positions in violation of the Flow-Through Agreement and had this time included in the longevity factor.  (iii) The FTPs, who were held back at American Eagle until all TWA-LLC Staplees were given positions at AAL, lost years of service at AAL that would have been included in the longevity factor but for the violations of the Flow-Through Agreement that occurred and but for APA's actions in connection with the remedy in FLO-0108, alleged in Paragraphs 55 through 59.

d.     The refusal to credit time at American Eagle flying as a regional jet captain because American Eagle is not a mainline carrier failed to account for FTPs career expectations and relied on assumptions that were unjustified and unsupported by facts.  (i) There is no meaningful distinction between flying a regional jet at USAir, included in longevity, and flying a regional jet at Eagle, excluded from longevity; (ii)  There is no meaningful distinction between flying as a Captain on a regional jet at American Eagle, excluded from longevity, and flying as a First Officer on small mainline jets at AAL or USAir, included in longevity.  (iii) The career expectations of a regional jet Captain at American Eagle were equivalent or superior  to the career expectations of a Captain or First Office on an a regional and on a non-regional jet, including jets flown at USAir;  (iv) The career expectations for FTPs in flying at AAL were established and defined by the Flow-Through Agreement and the FTPs placement on the AAL seniority list and occupational seniority number; (v) Time spent at Eagle following the execution of the Flow-Through Agreement was an integral part of FTPs career expectations to advance to future positions at AAL; and (vi) Pilots at other non-mainline carriers did not

28

1    have guaranteed expectations of advancement to flying for a mainline

2    that were similar to the rights of FTPs to jobs at AAL.

3    98.    There is a dispute between plaintiffs and the Class, on the one hand,

4    and APA and AAL, on the other hand, as to the ISL.  This dispute includes

5    whether the ISL is fair and equitable, whether the ISL was created in a fair and

6    equitable manner and whether the SLI process fairly represented and took account

7    of the interests of the FTPs.  A declaration, whether the ISL is fair and equitable,

8    whether the ISL was created in a fair and equitable manner and whether the SLI

9    process was fair and equitable in presenting and considering the interests of the

10    FTPs, is necessary so the parties can conform their conduct and use of the ISL to

11    the law and to prevent further violations of rights should the Court determine that

12    the ISL was not created in a fair and equitable manner.

### FIRST CLAIM FOR RELIEF

### (Breach of Duty of Fair Representation (Seniority List Integration Process [APA and AAL for purposes of a remedy])

16    99.    Plaintiffs incorporate the allegations in Paragraphs 1 through 98

17    hereof as if fully set forth in this Claim for Relief.

18    100.    APA has had a duty of fair representation towards the FTPs as to their

19    terms and conditions of employment with AAL, including representing the

20    interests of FTPs in the SLI process and in the ISL.  This duty arose when FTPs

21    obtained AAL seniority numbers on the AAL pilot seniority list and existed at all

22    times throughout the SLI process alleged herein.

23    101.    The duty of fair representation required APA to act in good faith

24    toward the FTPs and to refrain from discrimination and arbitrary conduct towards

25    or affecting them.

26    102.    By the acts alleged herein in connection with the SLI process, APA

27    has acted arbitrarily, discriminatorily and in bad faith towards the FTPs, plaintiffs,

28    the members of plaintiff AAFTPC and the Proposed Class by:  (a) stipulating and

1    agreeing that service at American Eagle will not be counted for purposes of the

2    factor of longevity in the SLI process and failing to provide plaintiffs a copy of the

3    stipulation; (b) proposing placement of FTPs on an integrated seniority list for

4    reasons that are arbitrary; (c) proposing placement of FTPs on an integrated

5    seniority list for the purpose of or with the effect of favoring TWA-LLC Staplees

6    and US Airways pilots over FTPs and reducing the future employment

7    opportunities at AAL for FTPs and enhancing the future employment opportunities

8    at AAL for TWA-LLC Staplees and US Airways pilots; (d) refusing to present

9    evidence in support of including service at American Eagle as part of any longevity

10   factor used for an integrated seniority list; (e) asserting and agreeing that longevity

11   should only include service at a mainline carrier; (f) refusing to provide

12   information to FTPs as to APA's positions in the SLI proceedings; and (g) refusing

13   to respond to requests for information and to take action in the SLI process because

14   of, and in retaliation for, the filing of a legal action against APA alleging breach of

15   its duty of fair representation owed to the FTPs.

16       103.   In addition to the actions alleged in Paragraph 102, AAPSIC 's

17   position that only mainline service should count in a longevity factor was contrary

18   to and inconsistent with AASPIC's understanding of the factors on which an

19   integrated seniority list should be based, as alleged in Paragraphs 72 and 73, and

20   was arbitrary, unreasonable and inconsistent with APA's previous positions,

21   assertions and understandings, as more fully alleged in Paragraph 85.

22       104.   By reason of the foregoing allegations in this Complaint APA has

23   breached its duty of fair representation towards the FTPs, plaintiffs, the members

24   of plaintiff AAFTPC and the Proposed Class in connection with the SLI process.

25   As a result of that breach, the ISL does not fairly and equitably integrate the FTPs

26   in placing them into positions on the ISL.

27       105.   Because of the breach of duty of fair representation alleged herein,

28   plaintiffs, the members of plaintiff AAFTPC and the Proposed Class (a) have had

their positions on the ISL seniority list adversely affected, (b) will suffer reduced employment opportunities and (c) have accrued and continue to accrue the costs of attorneys' fees incurred in establishing the breaches of duty by APA and attempting to mitigate the harms caused by APA's breach of duty.

106.   Monetary damages cannot fully compensate plaintiffs and the Proposed Class for the losses alleged herein and therefore plaintiffs request: (a) a declaration that APA has breached its duty of fair representation owed to the FTPs in connection with the SLI process; (b) a declaration that the ISL is unfair and inequitable as to the FTPs, that the ISL was created in an unfair and inequitable manner and that the SLI process was unfair and inequitable in presenting and considering the interests of the FTPs; (c) an injunction prohibiting APA or AAL from using the ISL in the future; and (d) an injunction requiring APA and AAL to create a new integrated seniority list that includes time spent at American Eagle as part of the longevity factor in creating the integrated seniority list.

**W H E R E F O R E**, Plaintiffs pray for relief as set forth in the Prayer.

## SECOND CLAIM FOR RELIEF

### (Violation of McCaskill-Bond Amendment [All Defendants])

107.   Plaintiffs incorporate the allegations in Paragraphs 1 through 98 hereof as if fully set forth in this Claim for Relief.

108.   The McCaskill-Bond amendment to the Federal Aviation Act, 49 U.S.C. § 42112 note ("McCaskill-Bond"), requires that seniority lists of carriers involved in a merger be integrated in a fair and equitable manner.

109.   The integration of seniority lists of AAL and USAir is subject to McCaskill-Bond.

110.   The seniority lists of AAL and USAir were not integrated in a fair and equitable manner and the ISL is not a fair and equitable integration of seniority, for reasons alleged in this action and including the following:

a.  APA, through AAPSIC acting as it agent, breached its duty of fair representation of the of the FTPs in connection with the SLI process and arbitration by the acts alleged in Paragraphs 102 and 103 and, in particular, by: (i) refusing to allow the FTPs to have separate representation in the process; (ii) presenting proposals that directly harmed the interests of FTPs that were not based on any relevant fact or factors; (iii) refusing to explain the basis for its proposals; (iv) refusing to present evidence favorable to the interests of the FTPs and refusing to explain why it would not do so; (v) adopting positions, including exclusion of time at American Eagle from longevity, that harmed the interests of FTPs without discussion or consultation with the FTPs;  (vi)  adopting positions, including exclusion of time at American Eagle from longevity, that favored the interests of the TWA-LLC pilots and perpetuated the adverse effects of APA's prior favoritism of the TWA-LLC pilots and the violations of the Flow-Through Agreement; and (vii) refusing to represent the interests of the FTPs, or provide explanations for its actions or positions, in retaliation for FTPs institution of litigation alleging a breach of APA's duty of fair representation.

b.  The SLI process did not result in an ISL that is fair and equitable as to the FTPs, as the ISL does not reasonably preserve the career expectations of the FTPs and relied upon arbitrary and unreasonable factors, as alleged in Paragraph 97, including in particular: (i) the ISL used a longevity factor that excluded time flying regional jets at American Eagle for FTPs, but included time flying regional jets for USAir pilots; (ii) the ISL excluded time flying regional jets at American Eagle on the basis that this was not "mainline" flying; (iii) the ISL used a standard of career expectations that failed to account

32

for the particular career expectations of FTPs arising from the Flow-Through Agreement; and (iv) the ISL perpetuated the effects of past discrimination against FTPs, past violations of the Flow-Through Agreement and past favoritism of TWA-LLC pilots.

111.    Monetary damages cannot fully compensate plaintiffs and the Proposed Class for the losses alleged herein and therefore plaintiffs request: (a) a declaration that the ISL is unfair and inequitable, that the ISL was created in an unfair and inequitable manner and that the SLI process was unfair and inequitable in presenting and considering the interests of the FTPs; (b) an injunction prohibiting APA or AAL from using the ISL in the future; and (c) an injunction requiring APA and AAL to create a new integrated seniority list that includes time spent at American Eagle as part of the longevity factor in creating the integrated seniority list.

**W H E R E F O R E**, Plaintiffs pray for relief as set forth in the Prayer.

### THIRD CLAIM FOR RELIEF

### (Violation of LMRDA [Defendant APA])

112.    Plaintiffs incorporate the allegations in Paragraphs 1 through 91 hereof as if fully set forth in this Claim for Relief.

113.    Section 101(a)(4) of the Labor Management Reporting and Disclosure Act ("LMRDA") (29 U.S.C. § 411(a)(4)) provides in part:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator. . ..

114.    Section 102 of the Labor Management Reporting and Disclosure Act ("LMRDA") (29 U.S.C. § 412) provides for a civil action by anyone whose rights under Section 101(a)(4) of the LMRDA have been infringed, and provides in part:

> Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

115.    At all material times in the SLI process, AAPSIC acted as an agent of APA and APA was, at all times, aware of AAPSIC's actions and conduct alleged herein and took no action to change AAPSIC's actions or prevent the adverse effects of AAPSIC's actions from occurring.

116.    APA and AAPSIC interfered with the rights of Plaintiffs under Section 101(a)(4) of the LMRDA to institute legal actions by:  (a) refusing to respond to Plaintiff's request for information as to AAPSIC's positions in the SLI process because Plaintiffs has instituted a lawsuit against APA; (b) refusing to respond to Plaintiff's request that AAPSIC put on evidence that any longevity factor used for an ISL include time at American Eagle because Plaintiffs has instituted a lawsuit against APA; (c) refusing to consult with or discuss issues with Plaintiffs because Plaintiffs has instituted a lawsuit against APA and (d) persisting in asserting in the SLI process that time at American Eagle should be excluded from any longevity factor as "non-mainline" time , even after purportedly withdrawing from the stipulation to that effect, because Plaintiffs has instituted a lawsuit against APA.

117.    The actions by APA and AAPSIC alleged herein deprived Plaintiffs and the FTPs of an opportunity to present their position in the SLI process, including an opportunity to meet and confer with AAPSIC on issues concerning FTPs, to address errors and inconsistencies in AAPSIC's positions, and to have AAPSIC present evidence and argument on behalf of the FTPs.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

118.   Plaintiffs are informed and believe, and thereon alleged, that Plaintiffs' seniority positions on the ISL were adversely affected by the actions of APA and AAPSIC alleged herein and, in particular, the would have superior seniority positions on the ISL had time flying for American Eagle been included in the longevity factor used for constructing the ISL.

119.   APA took the actions alleged in Paragraph 116 in bad faith and to perpetuate discrimination and injury to FTPs, in retaliation for Plaintiffs' exercise of their legal right to bring lawsuits and for the purpose, and with the intent, of vexing, injuring and harming FTPs, of preserving the advantages APA had obtained that favored TWA-LLC Staplees and of perpetuating the effects of past discrimination and violations of the Flow-Through Agreement that had harmed FTPs and benefitted TWA-LLC Staplees.

120.   For the reasons alleged in Paragraph 119, APA has acted with malice towards Plaintiffs and FTPs and Plaintiffs are entitled to punitive and exemplary damages against APA.

121.   Monetary damages cannot fully compensate plaintiffs and the Proposed Class for the losses alleged herein and therefore plaintiffs request: (a) a declaration that APA violated Section 101(a)(4) of the LMRDA in connection with the SLI process; (b) a declaration that, because of APA's violation of the LMRDA, the ISL is unfair and inequitable, the ISL was created in an unfair and inequitable manner and the SLI process was unfair and inequitable in presenting and considering the interests of the FTPs; and (c) an injunction prohibiting APA from using the ISL in the future.

**W H E R E F O R E**, Plaintiffs pray for relief as set forth in the Prayer.

## PRAYER

**W H E R E F O R E**, Plaintiffs pray for relief as follows:

1.  For an order certifying the action as a class action, appointing plaintiffs as Class Representatives and their counsel as attorneys for the Class;

2.  Against Allied Pilots Association (APA):

> (a) *On the First Claim for Relief:* (i) a declaration that APA has breached its duty of fair representation owed to the FTPs in connection with the SLI process; (ii) a declaration that the ISL is inequitable and unfair; (iii) an injunction prohibiting APA from using the ISL in the future; (iv) an injunction requiring APA and AAL to create a new integrated seniority list that includes time spent at American Eagle as part of the longevity factor in creating the integrated seniority list; and (v) attorneys' fees incurred in establishing the breaches of duty by APA and attempting to mitigate the harms caused by APA's breach of duty.

> (b) *On the Second Claim for Relief:* (i) a declaration that the ISL is unfair and inequitable, that the ISL was created in an unfair and inequitable manner and that the SLI process was unfair and inequitable in presenting and considering the interests of the FTPs; (ii) an injunction prohibiting APA or AAL from using the ISL in the future; and (iii) an injunction requiring APA and AAL to create a new integrated seniority list that includes time spent at American Eagle as part of the longevity factor in creating the integrated seniority list; and (iv) attorneys' fees incurred in establishing that ISL was created in an unfair and inequitable manner and that the SLI process was unfair and inequitable.

1          (c)  *On the Third Clam for Relief*:  (i) Punitive and exemplary

2               damages against APA; (ii) a declaration that APA violated

3               Section 101(a)(4) of the LMRDA in connection with the SLI

4               process; (iii) a declaration that, because of APA's violation of

5               the LMRDA, the ISL is unfair and inequitable, the ISL was

6               created in an unfair and inequitable manner and the SLI process

7               was unfair and inequitable in presenting and considering the

8               interests of the FTPs; and (iii) an injunction prohibiting APA

9               from using the ISL in the future.

10     3.     <u>Against American Airlines, Inc.</u> (AAL): *On the First and Second*

11            *Claims for Relief:* (i) A declaration that the ISL is inequitable and

12            unfair as it deprives and does not protect the career expectations of

13            Flow-Through Pilots; (ii) An injunction prohibiting AAL from using

14            any integrated seniority list arising from the SLI process; and (iii) An

15            injunction requiring APA and AAL to create a new integrated

16            seniority list that includes time spent at American Eagle as part of the

17            longevity factor in creating the integrated seniority list.

18     4.     Plaintiffs' costs of suit and reasonable attorney fees.

19     5.     Such other and further relief the Court may deem appropriate on the

20            evidence presented.

21

22  Dated:  March 6, 2017.              KATZENBACH LAW OFFICES

23                                      By __s/ Christopher W. Katzenbach____

24                                         Christopher W. Katzenbach
                                           Attorneys for Plaintiffs AMERICAN AIRLINES
25                                         FLOW-THRU PILOTS COALITION,
                                           GREGORY R. CORDES, DRU MARQUARDT,
26                                         DOUG POULTON, STEPHAN ROBSON, and
                                           PHILIP VALENTE III on behalf of themselves
27                                         and all others similarly situated

28
                                        37

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues and claims for relief in this action.

Dated:  March 6, 2017.                KATZENBACH LAW OFFICES

By  s/ Christopher W. Katzenbach

Christopher W. Katzenbach
Attorneys for Plaintiffs AMERICAN AIRLINES
FLOW-THRU PILOTS COALITION,
GREGORY R. CORDES, DRU MARQUARDT,
DOUG POULTON, STEPHAN ROBSON, and
PHILIP VALENTE III on behalf of themselves
and all others similarly situated

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF